h th  th th th th th th f th Good morning, your honors. May it please the court. My name is Maggie Carfield and I represent the plaintiffs. The plaintiffs in this case are adults with developmental disabilities and the independent service coordination agencies that serve them. This court should reverse the district courts order denying plaintiffs motion for preliminary injunctive relief for two reasons. First, the selection and funding scheme implemented by defendants violates plaintiffs' rights under the Freedom of Choice provision of the Medicaid Act. Second, the policies related to this scheme were never properly promulgated in violation of the Illinois Administrative Procedures Act. This case essentially boils down to whether state agencies, agencies that have been charged with the duty of protecting the health and well-being of some of the state's most vulnerable populations, will be allowed to ignore the rights of those very same people by circumventing federal and state laws that were adopted for the very purpose of ensuring that all citizens are given an opportunity to exercise choice in their lives. Turning to the first issue of Freedom of Choice, I will focus my arguments today on three considerations. One, the role of so-called individual service and support advocates, who I will refer to today because it's a mouthful, as ISSAs or advocates. Two, the law that supports plaintiffs' rights to select the ISSA of their choice. And three, why the distinction between administrative case management and direct case management services is a rabbit hole that this court should not go down. I'd like to start with that rabbit hole, if we could. Absolutely. I think that's decisive here. Under the state's plan, these case management services are not waiver services, so they don't engage the free choice of provider provision in the Medicaid Act. They're strictly administrative. The state is in the driver's seat in determining which agencies it wants providing these services, not the Medicaid recipient. So we respectfully disagree with that position? Well, that's how they're classified under the program. The most recent renewal of the program, that document classifies them as administrative services, which takes them outside of waiver services that are provided to Medicaid recipients as part of their aid package. So, two points. One is that it says that they provide case management services, but that it will be funded as an administrative activity. So that's one issue, is that it's funded as an administrative activity. The second issue is that while the waiver was, in fact, approved by CMS, there are many cases where CMS approves a waiver, and then later, once they have the opportunity to see what is actually happening on the ground, what services are truly being delivered, how states are requesting reimbursement, they realize that what was represented in the waiver application is not what is truly going on, and that's what we are suggesting is happening today. So while, yes, it is true that the state of Illinois represented on the waiver application that these are administrative services activities, it is very clear that if you look at what the services that ISSAs are providing, they are far from what— Why isn't that a matter for CMS and the state? Because under the— If they're classified under the program, we take the program as it comes to us, and if these services are classified as not waiver services, that's the term of art applicable to the Medicaid assistance that's provided to Medicaid recipients, if they're classified as administrative services, and if that's a misclassification, even though CMS has endorsed it, that's a matter for the federal regulators to fight out with the state regulators. So it's— But it is clear that it is— Well, yes, it is true that— Nothing's clear in this case in terms of the regulations. Well, that's the only thing that is clear, is that nothing is clear. Right, it's just— Exactly. It's an alphabet soup, as agency cases usually are. Exactly. Right. So I would say that it is up to the Secretary of Health and Human Services—that's very clear in the law—and not a state to make the determination of how an activity should be classified or how a service should be classified. That's purely a matter for the state and its federal regulators to decide how it's going to set up its program, what services it will provide, and then if it secures federal consent—if the state, that is, secures federal consent for the program, off it goes, and there isn't any role for a court. I think that when we have an issue like we do where there's a violation of rights, the Medicaid— Well, that begs the question. The key question is how these services are classified. And the free choice provider provision is engaged only with respect to waiver services, services that are actually provided and classified as such under the state plan. Correct. And these aren't in that category. Correct. So what we contend, however, is that it was misrepresented on the waiver application. And I'd like to talk about why that is. I assume there are administrative remedies for aggrieved agencies who've been cut out. For aggrieved agencies, because it was a year-to-year contract, once the contract expires, because there's no longer—one could argue there's no longer an expectation or an entitlement to that contract, it's difficult to say whether or not they are covered under some of the provider protections that the Medicaid Act does have. So if you're a willing and qualified provider who is cut out and you have sort of an ongoing contract, then there are remedies for you, administrative remedies. But what we have here is providers whose contract is year-to-year, and so once it ended, it's less clear that there are administrative remedies for those particular providers. What is clear is that Medicaid beneficiaries have an absolute right to choose the provider of their choice. Can I ask you a question on that point? This is not as much legal as it is practical, but it seems like, if I understand your argument right, the logical extension of it, maybe the legal extension of it, is that Illinois has been way off base, wildly off base, for years in the way they've approached this. Because now there's a fixed number, 12. It used to be 17. If the free choice of provider provision applies, that's entirely inconsistent with the notion of having a fixed number, right, of ISCs. So is that to say that, you know, Illinois has gotten this wrong or the Department has gotten it wrong forever? So, as it used to be prior to this year— You can't have a fixed number. Correct. That is correct. I mean, is that what you're saying? Your argument is legal, right? It's not just for the agencies that you represent, but it has to be an unlimited number of ISCs that would be, you know, legally compelled. So— Because they'd be equivalent to a direct service provider. Right. And this is where it gets very complicated. And part of what we are arguing is that this issue of the distinction between administrative services or administrative case management services and direct case management services should have been an issue that was raised at the district court level. And it wasn't. The issue—the argument at the district court level was that the ISCs or the ISAs are not providers because they don't provide direct services. That's a very different argument than they're providing administrative services. That came along after, you know, going through the entire briefing process, the preliminary injunction hearing process, and even in the emergency injunctive. None of that—the issue of this distinction never came up until the appellate briefing stage. And we contend that because of the complexity of this issue, that there should have been—we should have had an opportunity to present all of the evidence. So— Ms. Carman, were you precluded from doing that? Because the argument wasn't raised and we weren't quite sure why they were limiting or why they thought that they weren't required to comply with the freedom of choice provision, we were expecting that that might be an argument that they would offer. But because they didn't and instead they said they're just not providers, that was the issue that we responded to at the district court level. What relief are you seeking today? That's an excellent question. And I have talked with my clients a great deal about this because obviously there's already been a major overhaul of the system that has caused a lot of disruption in the lives of this very— And the possibility of further disruption should a change occur, right? Correct. And this ties back into your question, Your Honor, is that ultimately we're not looking—because I do think that there is a right to limit, that they could seek permission to limit the number of ISC agencies under the law. They would have to seek—I think they'd have to seek permission. I don't think just checking— If they're qualified providers? Because there are exceptions under the law for some administrative activities if they comply with what actual administrative case management is. And that's very clearly laid out in law is things like eligibility determinations, screening of clients, monitoring, utilization review, things that a state agency normally does. These are things that other states do, but they farm them out to these ISC agencies. So there's that component that we're talking about. And then we have these advocates who are employed by the ISC agencies. They make up two-thirds of the budget. I don't know why it's not called—oh, I do. I do have a thought about why it's not called the ISSA Notice of Funding Opportunity. And that's because I think they know that these are direct case management services. They're funded the same way all other services are, as fee-for-service. They are treated—when you look at the definition of direct case management under the law and the regulations, what ISSAs are doing mirrors exactly the statute and the regulations. Ms. Garfield, how do we undo what has occurred? Yes, so back to your question. So we're not suggesting that everything be—that we wind the clock back. That would be too disruptive. Ultimately, what we want is for people to have a choice as to their ISSA, as to those advocates specifically. There are other parts of the ISC agencies, other things they do, that we can see, you know, why there's not a reason to have three different agencies who are determining eligibility. But as to the issue of who's going to be your advocate, who's going to go and identify—write your service plan, identify providers, make sure those providers are doing the job they're supposed to do. All of the things that we think of social workers doing, for that, people should have a choice. And so in the interim, what we would like to propose is that, just as what we would ultimately hope would happen, is that there would be an opportunity for Medicaid consumers to choose the ISSA that they would like. Hold on a second. If you're not asking, as you put it, for the clock to be rewound, are you still appealing the denial of preliminary injunctive relief? I mean, your case isn't over. You've been denied a preliminary injunction. I think that what we're seeking is—we realize that this is a very unique situation, so we are seeking equitable injunctive relief. What would that injunctive relief look like? So I think that what we're—what I mean that we don't want to rewind everything, because ultimately we don't. We don't think the system before, which—let me just clarify. The system before did not actually put a limit on the number of providers. What it was was a request for applications. So theoretically, you could have more than one ISC apply to a region. That's, I think, how they do it with other Medicaid providers. They request—they say, are you qualified? If you're qualified, you know, we're going to send out a request for applications. Are you qualified? As long as you're qualified and you're willing, then you can provide Medicaid services. But this year, they changed that, and they made it a competitive bidding process, which we contend is not even lawful under the Medicaid Act. Are you—but are you abandoning your request for us to reverse the denial, the preliminary injunction, and are you just saying, look, I'd like to go back and develop these arguments? No. What we are—so we are requesting that you reverse the district court's order denying and that what we would like is an order granting our motion for preliminary injunction. But we think it would make the most sense that we work with the district court judge and the defendants to figure out a way that, for the interim, consumers can have a choice as to their ISSA providers. And until the final merits of this case are decided, that would avoid an entire upheaval of the system. It would be a step towards what we are ultimately asking for. And we think that what we're wanting is something that's reasonable. My clients actually truly care about the people that they're working with. This is not—despite what defendants say, this is not about a contract. This is about people's lives, people who are extremely vulnerable. Well, would we have a situation, if you suggest we go that route, Ms. Garfield, of people who are now being attended under the new contract being— their providers would then ask them, do you want to stay in your current status or move to a new one? You think that would be beneficial to the ultimate people who really are involved here, the patients? I do. Just like all of us, we all want to have choice in terms of who is going to provide us our health care, who is going to be the provider, and that's what this ultimately comes down to. Do you want to save a little time for rebuttal? I do. All right. Thank you very— I don't want to cut you off, but, you know— Did this start at 15 or 20? I actually didn't— You have two minutes left. It's your time, but— All right, so I will turn it over to opposing counsel and revisit with you soon. Thank you. Thank you very much. Ms. Jennifer? Good morning, Your Honors, and may it please the Court. I'm Assistant Attorney General Kaitlyn Schoenever, and I represent the State Defendant's Applees. State Defendant's Applees do not believe that the plaintiffs have established the threshold requirements to warrant preliminary injunctive relief here, but I'd first just like to touch on the balance of harms, as this Court has recognized and discussed already today. The contracts that are issued here went into effect on July 1, 2019, so the extraordinary relief that was requested by the plaintiffs below becomes even more extraordinary before this Court because, essentially, the Court would be having to undo the contracts that have been in effect for nearly three months and disrupt services yet again to these individuals. And I would like to just state, you know, this case is not really about Medicaid's free choice of provider statute based on the relief requested by the plaintiffs here. And the extraordinary relief requested by plaintiffs here shows as much. The ISC plaintiffs did not seek an order allowing the individual plaintiffs to work with any ISC agency that they wanted to. Instead, the request for relief below asked to divert funds away from ISC agencies that had won contracts and award those contracts to the ISC plaintiffs so they could provide the services. But turning to the threshold requirements for injunctive relief, plaintiffs failed to show a likelihood of success on the merits as to either of their claims. Turning first to the allegations that the defendants violated Medicaid's free choice of provider statute, as discussed at length in the brief, this case does involve consideration of the phrases case management service as well as medical assistance. But because this case involves the state's HBCS waiver under Section 1915C of the Medicaid Act, we have to look to the waiver itself to determine how to define and describe these services. This waiver, which is submitted by the Illinois Department of Health Care and Family Services on behalf of the state and is approved by the federal government through CMS, governs how the state provides services to these individuals in community-based settings as opposed to in institutions. And so these phrases must be analyzed according to the terms of the waiver. And when completing the waiver, CMS gave states the choice to provide case management services as a participant waiver services available to individuals or to provide it as an administrative and operational function of the waiver. And at District Court Doc 30-1 at page 104, it clearly states case management services, and there are several choices that a state can make to provide those as either waiver services or as administrative services, and the state of Illinois here chose to provide them as administrative activities. That choice was affirmed by CMS when they approved the waiver. But your adversary is saying, look, don't elevate form over substance here. You know, we need to figure out as a substantive matter what the nature of the services are. To the extent there were any concerns by any particular ISC agency that case management service had been mislabeled or miscategorized on the waiver, I would note that there is a period of public notice and comment for these waivers. On pages 7 and 8 and 11 through 15 of the waiver, it describes what the state and the department did in sharing the waiver with different agencies and individuals who might be infected or have thoughts. On 7 and 8 and pages 11 through 15, it describes some of the issues and concerns that were raised when preparing this waiver. And so to the extent there is a concern that case management services are miscategorized, there is a way for ISC agencies or any other agency or individual to voice those concerns to the department. And again, I would note that the Medicaid statute itself, 1396 NC4B, does allow for states. It says that states may provide medical assistance to individuals for case management services under their waiver, but it's not required. And moreover, the federal regulations concerning Medicaid 42 CFR 44.180B1 specifies that home and community-based services can include a variety of services, including case management services, but those services are as defined by the agency and as approved by CMS. And again, here the state chose to define case management services as administrative functions, and that choice was approved by CMS. As a result, these ISC agencies are not providing medical assistance. They are providing administrative and operational services. Accordingly, Medicaid's free choice of provider statute does not apply because on its own terms it only applies to medical assistance. I'd also just like to briefly respond to the point that this argument that the ISC agencies are providing administrative and operational services was waived by not being discussed below and was raised for the first time on appeal. I believe that argument misses the point because at its core, the argument in the district court and before this court has been the same, and that is that the waiver applies and governs. When responding to plaintiffs' motion for preliminary injunctive relief, the state defendants attached the waiver, and on pages 8 to 9 of the state defendants' brief, we argued that ISC agencies are administrative entities under contract with the state whose function is to connect individual participants with willing and qualified providers of service. During that argument, we cited several portions of the waiver, including page 17, which lists ISC agencies as providing administrative and operational services. To the extent that there was discussion about below, the argument was that the free choice of provider statute doesn't apply because ISC agencies are prohibited from providing direct services. Again, that's just really one and the same argument. The idea is that these agencies and its employees are providing administrative and operational services, not direct services and medical assistance to these individuals. And that's just the fact that these ISC agencies are prohibited from providing direct services is simply a matter of fact set forth in the waiver, District Court Doc 30-1 at 122, as well as in the NOFO that was issued for fiscal year 2020 at District Court Doc 15-1 at 21, which specifically states that case management services cannot provide direct services to individuals. If plaintiffs did not address the state law claim, but as discussed in our brief, any injunctive relief based on any alleged violation of state law, would be barred under the 11th Amendment, according to PennPERST. The only question I have about, and I don't know whether the Intervenors Council is going to want to raise this, but the only question I have is trying to get my head around the scope of what has been at issue or what remains at issue in the state proceedings, vis-a-vis the couple of state law claims that are in the federal pleading here. So there's two pending state law or state cases. One is an administrative review action from the department's decision to affirm the grant of the NOFO to different ISC agencies. The other is a state case alleging, I believe it's just the violation of the APA, and there may also be one other claim in there I can't recall off the top of my head right now. But the one state law case does involve very similar allegations that the state violated the APA. In seeking an emergency motion to stay the department's administrative decision in one of the state law cases, Judge Katz in that case also looked at the APA claim, and similarly as we argued in our brief said that the contract exception to the APA may apply here, and so that decreased the likelihood of success on that claim. And what about with respect to the, I don't know how you refer to it, the GATA? The GATA claim? Yeah. I apologize, Your Honor, I'm not well briefed on the state case at this time, but I'm not certain that there's a separate GATA count that is alleged in the state court case. I believe that's similar here, it's sort of incorporated into the APA claim, and the allegation as I understand it is that regulations were supposed to be enacted pursuant to GATA, and by failing to do that, that creates then an APA violation for failing to promulgate a rule, as I understand it. And again, I apologize, I don't have the full state court case briefed off the top of my head, but I don't believe that there was a separate GATA claim in the state court case. If the Court has no further questions, we ask that this Court affirm the District Court's decision. Thank you. Thank you, Ms. Schoenberg. Mr. Kiley? Good morning, Your Honors, and may it please the Court. I am Jack Kiley. I represent the intervenors in this case, Prairieland and Service, Inc. Our intention today was to come and discuss the reasons the District Court and this Court on the emergency basis were correct in denying a preliminary injunction sought by the plaintiffs. I'll still address those matters, but based on what I'm hearing, you know, our main priority was making sure that our clients, the intervenors' contracts, remain intact. It doesn't sound like the plaintiffs are necessarily seeking to attack that or undo that, but I would just like to discuss briefly a couple of things. One, with respect to the state case, if there's any more information sought on that, initially they had sought to file the administrative act along with a chance reaction for seeking an injunction. For, I think, reasons unknown to all of us, the state court required or the clerk required that those be severed, so those have been kind of going along at different stages. The injunction action is now on appeal, and then the administrative action, I think, is as indicated by the state, a stay was sought and now it's denied. So that's basically where those two cases sit. The appeal on the injunction matter is nearly fully briefed, and we expect to have arguments on that in the next couple of months, I would imagine. What about with respect to the scope of the claims? The scope of the claims, I would agree with the state that the GADAC claims kind of run in conjunction with the IAPA claims, and there was more of a sense it was described as a parallel case, although the state case didn't embrace the Medicaid element that this case has, and I think initially there was also the issue of maybe more of a claim of a due process right in the contract, and that seems to be abandoned a little bit. I think the case law is clear that there is no expectation of a contract, no due process rights there for future contracts. One of the issues we raised in prior pleadings was there was also in that particular case a proposed settlement. Judge Katz has invalidated that settlement, which has led now to the appeal on the injunctive side of things as well. Clearly for us, for the interveners, our concern is prejudice not only to the interveners but also to the public at large. We have now completed almost a full quarter of our contract under the contract that was awarded in effect of July 1st. One of the things that we're concerned about, even if this court or another court were to determine that somehow these rules weren't administered properly from a procedural standpoint, there's no indication of any prejudice to the ISC plaintiffs in this particular case. There's no indication that Prairie Land or Service Inc. or any other winning bidder had an upper hand and this was anything but a level playing field. In other words, as the NOFO was administered or as the NOFOs were submitted, I don't think there's even any claim that somehow the winning bidders were put at an advantage or the losing bidders were put at a disadvantage. And we cite the Schenkel case, which is on page 12 of our brief, which indicates if a rule isn't followed but there's no prejudice, then basically there's harmless error. And we'd be taking the position here that that is exactly what's happened. There's no indication that these ISCs weren't qualified, aren't qualified, and we believe that they were justifiably awarded the NOFO. And again, they learned of this in January. All of us learned of this in January, that these particular winning bidders were going to be taking over the contract in July of this year. When that happened, this wasn't just a six-month period to look forward to. There was a lot of work. There was transitioning. There was hiring people. There were office rentals. There was equipment purchases. This was a large undertaking by both Prairieland and Service Inc. We would be greatly prejudiced if the relief initially sought in depriving us of that contract were to be entered. Did your clients hire the social workers who were previously employed with the plaintiff agencies? Absolutely. So those relationships are intact. That would usually be the case. That's exactly right. That's exactly right. To the extent that it was possible. I think in some respects it was almost across the board from one agency to the other. Right. So the Medicaid recipients are being managed. Their cases are being managed by the same social workers that used to work for them. I think to the extent possible. There was some turnover, I think, in one particular zone, but I think the intent certainly of our clients would be to maintain a seamless transition as best we could. That also required the cooperation of the outgoing ISCs to continue in the transition process up until July 1. But certainly to echo the plaintiffs here, our clients also have these people's best interests at heart and in mind, and so absolutely they wanted to make sure this transition was as seamless as possible. And frankly, it's less work for them if the same person can inherit and take over that particular job. The reimbursement rate differs depending on how case management services are classified? Correct. And that was the impetus for shifting to this method? I'm sorry? That was the impetus for shifting to this method, or is that unclear? That's unclear to me, yes. As far as the one final point I wanted to mention that we bring up in our brief as far as mootness and latches, this matter was filed in June. We're now here in the September, and we've been in front of the district court. This court took up an emergency appeal, and we're here again today. If we accept the four-month timeline between the time this initial matter was filed with the district court until now, we're at less than four months. And had this been filed, matter been filed earlier in the year, and we just assume that same timeline, this matter could have been resolved before July 1st, or at least we had a chance. And so the prejudice not only to the interveners here, but all of the winning bidders in the state, all 12 of them, is significant. And I think the same for the individual plaintiffs and all other folks receiving services that, you know, had this been able to be addressed in March, April, May, and June, it may be a different outcome. But certainly the prejudice to the interveners here as well as the public at large is aggravated by the delay. And again, going back to our initial point in the Schenkel case, we don't believe there's any prejudice shown for them not winning these particular contracts. And for that reason, we would ask that the district court decision be affirmed. Thanks. Thanks, Dan. In just the couple of remaining moments that I have, I want to address a couple of points that were just brought up. First is this issue of this being a seamless process. I think that that possibly mischaracterizes what has happened. And it's not at all due to the other ISC agencies. And really, I want to say, while, yes, they were notified in January, so there's been four months between the filing and when they found out, it's been five years since GATA was adopted and the state was told that they needed to implement procedures and policies related to grant making. And hopefully you received the supplemental authority that we submitted yesterday where they finally acknowledged for the first time, although they didn't tell anyone about it, that they are required to adopt rules under GATA and they are required to follow the Administrative Procedures Act. And so if they had done that, they actually have caused a great deal of prejudice. And no offense to any of the agencies here, what we are concerned about are the individuals. And there's a great deal of prejudice, not only because of the not-so-seamless process that has occurred, but because these individuals no longer have the right to choose their provider. And I want to just say that under the waiver— Well, that gets back to Judge Scudder's question earlier. They never really did have the right to choose their provider. They had to choose from a suite of case management agencies. So they actually did. And the state even had a form in 2014 that was a transfer for ISSA services because they knew they were directed to do that by the federal government. Within the list of 17, though. I'm sorry? Go ahead, Judge Sykes. Within the list of 17, Medicaid recipients never were permitted to choose any agency they wished to help them with their eligibility applications and their renewal applications and other case management services. They had to choose from the suite of 17 agencies. May I answer? Of course. Just like any Medicaid beneficiary, they can't choose any doctor. That doctor has to be willing and qualified. And so, as it was before, there were only 17 or 18 ISCs who had submitted applications to say, we want to provide these services. So they had the choice between those agencies. Now they don't. That has been taken away. And the waiver, I'm sorry. Actually, I know I can't do that. So I will just say, for these reasons, we would ask this court to reverse the district court's order and grant plaintiffs equitable relief. Thank you. Ms. Garfield, thanks to all counsel. The case is taken under advisement.